[No. S091453. Dec. 4, 2002.]

FILIPINA JIMENEZ et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
T.M. COBB COMPANY et al., Real Parties in Interest.

## COUNSEL

Niddrie & Hegemier, David A. Niddrie; Eppsteiner & Associates, Stuart M. Eppsteiner and Neal A. Markowitz for Petitioners.

Anderson & Kriger and Mary M. Best for William E. Casey et al., as Amici Curiae on behalf of Petitioners.

Reed Elliott Creech & Roth, John W. Elliott and Thomas A. Elliott for Orchard Glen Venture, Eagle Square Partners, Prometheus Income Partners, Benton Park and Kensington-Fair Oaks Associates Joint Venture as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

McAtee • Harmeyer, Jeff G. Harmeyer, Greg A. McAtee and Robert J. Hudock for Real Party in Interest Viking Industries, Inc.

Horton & Ryan, Sullivan & Christiani, William B. Sullivan and Toni L. Christiani for Real Party in Interest T.M. Cobb Company.

Acker, Kowalick & Whipple and Brian F. Drazich for Premier Window Products Corporation and Guaranteed Products Corporation as Amici Curiae on behalf of Real Parties in Interest.

Monteleone & McCrory, William J. Ingalsbe and G. Robert Hale for Southern California Ready Mixed Concrete Association as Amicus Curiae on behalf of Real Parties in Interest.

Sieving & DeMund, Sieving & Momjian, Richard N. Sieving and Julie P. Momjian for Jeld-Wen, Inc., as Amicus Curiae on behalf of Real Parties in Interest.

McCutcheon, Doyle, Brown & Enersen, Michael I. Begert, Frank Kennamer and Todd A. Williams for Louisiana-Pacific Corporation as Amicus Curiae on behalf of Real Parties in Interest.

Summers & Shives and Robert V. Closson for Professional Association of Specialty Contractors as Amicus Curiae on behalf of Real Parties in Interest.

Sullivan Wertz McDade & Wallace and John S. Moot for Overhead Door Corporation as Amicus Curiae on behalf of Real Parties in Interest.

Cooper, White & Cooper, Kathleen F. Carpenter, Alan H. Packer and Derek A. Ridgway for California Building Industry Association as Amicus Curiae.

## OPINION

**KENNARD, J.**—In California, a manufacturer, distributor, or retailer of a defective product is strictly liable in tort for any resulting harm to a person *or* to property other than the product itself. This case presents two issues: (1) Can a manufacturer of windows installed in a mass-produced home during its construction ever be strictly liable in tort for harm resulting from defects in those windows? (2) If so, is that manufacturer strictly liable in tort for resulting physical damage to other parts of the house in which the windows have been installed? We answer "yes" to both questions.

### I. FACTS AND PROCEEDINGS

In 1988, developer McMillin Scripps II completed the Galleria and Renaissance housing developments in the Scripps Ranch area of San Diego. Viking Industries, Inc. (Viking) manufactured the windows in the Galleria development; T.M. Cobb Company (Cobb) manufactured the windows in the Renaissance development.

Plaintiffs Filipina and Nestor Jimenez, owners of one of the Galleria homes, brought this action against window manufacturers Viking and Cobb, and also against two companies (Medallion Industries, Inc., and Minnoch Supply Co.) that had supplied and installed the windows. On behalf of themselves and all homeowners in the Galleria and Renaissance developments, plaintiffs asserted that defendants had "designed, developed, manufactured, produced, supplied and placed into the stream of commerce" defective windows installed in the Galleria and Renaissance homes, and that the defects caused property damage. They alleged strict liability and negligence causes of action.

Window manufacturer Cobb moved for summary adjudication of the strict liability cause of action. Cobb argued that the manufacturer of a product installed in a mass-produced home, unless it has ownership or control over the housing development, cannot be held strictly liable to a homeowner for a defective or dangerous condition in the home. In response, plaintiffs conceded that Cobb did not own or control the Renaissance housing development, but they argued that manufacturers of component parts of mass-produced houses are strictly liable for damages caused by those component parts, including damage to other parts of the houses in which they are installed. Plaintiffs asserted that the allegedly defective windows installed in their home had damaged the "stucco, insulation, framing, drywall, paint, wall coverings, floor coverings, baseboards, and other parts of the home."

The trial court granted window manufacturer Cobb's motion for summary adjudication. The parties later stipulated, and the trial court ordered, that the

ruling also applied to window manufacturer Viking. Plaintiffs petitioned the Court of Appeal for a writ of mandate.

The Court of Appeal issued a writ directing the trial court to vacate its order granting the defense motion for summary adjudication. It held that the doctrine of strict products liability applied to manufacturers of defective component parts installed in mass-produced homes, and that this strict liability extended to injuries to other parts of the house in which the defective component was installed. We granted the petitions for review of defendant window manufacturers Cobb and Viking.

## II. RELEVANT CASE LAW

Nearly 60 years ago, in a concurring opinion in *Escola v. Coca Cola Bottling Co.* (1944) 24 Cal.2d 453 [150 P.2d 436], then Justice Roger Traynor expressed his view that a *manufacturer* should be liable in tort for placing on the market a defective product that causes personal injury. (*Id.* at p. 461 (conc. opn. of Traynor, J.).) Such liability, Justice Traynor reasoned, was justified because of a consumer's inability to prove that a defect was caused by a flaw in the manufacturing process, because the manufacturer is best able to reduce the risks of injury caused by product defects, and because a manufacturer can equitably distribute the loss broadly among the buying public as a cost of doing business. (*Id.* at pp. 462-463.)

Two decades later, in *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049] (*Greenman*), this court embraced Justice Traynor's view, and California became the first state to allow recovery for strict products liability. We held: "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." (*Id.* at p. 62.) We explained that such liability was necessary to protect injured consumers "who are powerless to protect themselves" because the law of contractual warranties developed for commercial transactions offered no protection to those harmed by defective products. (*Id.* at p. 63.)

The next year, in *Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168] (*Vandermark*), we extended strict products liability to *retailers*. We said: "Retailers like manufacturers are engaged in the business of distributing goods to the public. They are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products." (*Id.* at p. 262.) We reasoned: "In some cases the retailer may be the only member of that enterprise reasonably

available to the injured plaintiff. In other cases the retailer himself may play a substantial part in insuring that the product is safe or may be in a position to exert pressure on the manufacturer to that end; the retailer's strict liability thus serves as an added incentive to safety. Strict liability on the manufacturer and retailer alike affords maximum protection to the injured plaintiff and works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship." (*Id.* at pp. 262-263.) Thereafter, distributors and suppliers were also held strictly liable in tort for injuries caused by defective products. (*Cronin v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 130 [104 Cal.Rptr. 433, 501 P.2d 1153]; *Barth v. B.F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228, 252-253 [71 Cal.Rptr. 306].)

In 1969, the Court of Appeal in *Kriegler v. Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224 [74 Cal.Rptr. 749] applied strict products liability to mass-produced homes. There, the plaintiff homeowner successfully sued the developer of mass-produced homes in strict liability for damages caused by the failure of a radiant heating system in the home. The Court of Appeal affirmed the judgment. It pointed out that a developer of defective mass-produced homes, like a manufacturer, retailer, or supplier of another product, is responsible for dangerous conditions in its own products and is in a better economic position to bear the resulting loss than the consumer, who justifiably relied on the developer's expertise in constructing mass-produced homes. (*Id.* at p. 228.) The *Kriegler* court explained: "We think, in terms of today's society, there are no meaningful distinctions between Eichler's mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same." (*Id.* at p. 227.)

Thereafter, the Court of Appeal in *La Jolla Village Homeowners' Assn. v. Superior Court* (1989) 212 Cal.App.3d 1131 [261 Cal.Rptr. 146] (*La Jolla Village*) held that a subcontractor hired by a developer cannot be strictly liable for defects in mass-produced homes, unless it also owns or controls the housing development. Although earlier decisions had concluded that strict products liability did not apply to ordinary subcontractors because they provided services rather than products, the *La Jolla Village* court suggested a broader subcontractor exception, under which strict products liability did not apply to "subcontractors in the typical real estate construction project *regardless of whether they provided 'services' or a 'product.'* " (*Id.* at p. 1146, italics added.) Courts in later cases have disagreed on the soundness of this expansion. (Compare *Monte Vista Development Corp. v. Superior Court* (1991) 226 Cal.App.3d 1681, 1686 [277 Cal.Rptr. 608] [treating statement as nonbinding dictum] with *Casey v. Overhead Door Corp.* (1999) 74

Cal.App.4th 112, 119-120 [87 Cal.Rptr.2d 603] [treating statement as controlling].)

The Court of Appeal in this case was the same Court of Appeal (that is, the same division of the same appellate district) that decided *La Jolla Village, supra,* 212 Cal.App.3d 1131. Interestingly, the Court of Appeal in this case criticized its own earlier statement in *La Jolla Village* that even subcontractors who provide products generally cannot be strictly liable in tort for defects in mass-produced houses. The court characterized its earlier statement as "overstated" and "dictum" and this time concluded that subcontractors providing products may be strictly liable for defects in mass-produced homes. The court retained the limitation, consistent with established law, that persons providing only services are not subject to strict products liability. (See *Murphy v. E.R. Squibb & Sons, Inc.* (1985) 40 Cal.3d 672, 677 [221 Cal.Rptr. 447, 710 P.2d 247] [strict products liability law does not apply to services]; *Gagne v. Bertran* (1954) 43 Cal.2d 481, 487 [275 P.2d 15] [those who sell services not liable in absence of negligence or intentional misconduct]; *Pierson v. Sharp Memorial Hospital, Inc.* (1989) 216 Cal.App.3d 340, 345 [264 Cal.Rptr. 673] [law of negligence, not strict liability, governs services]; Rest.3d Torts, Products Liability, § 19, subd. (b) ["Services, even when provided commercially, are not products"].)

### III.  STRICT PRODUCTS LIABILITY OF COMPONENT MANUFACTURERS

■ Citing *La Jolla Village, supra,* 212 Cal.App.3d 1131, defendant window manufacturers contend that because they merely supplied component parts (the windows) of mass-produced homes, not the completed homes themselves, they should not be subject to strict products liability. They argue that extending strict products liability to component manufacturers would not serve the purposes of strict products liability. We disagree.

The policies underlying strict products liability in tort, restated in our decision in *Vandermark, supra,* 61 Cal.2d 256, are equally applicable to component manufacturers and suppliers. Like manufacturers, suppliers, and retailers of complete products, component manufacturers and suppliers are "an integral part of the overall producing and marketing enterprise," may in a particular case "be the only member of that enterprise reasonably available to the injured plaintiff," and may be in the best position to ensure product safety. (*Id.* at p. 262.) And component manufacturers and suppliers, like manufacturers, suppliers, and retailers of complete products, can adjust the costs of liability in the course of their continuing business relationship with other participants in the overall manufacture and marketing enterprise. (*Id.* at pp. 262-263.) For purposes of strict products liability, there are "no meaningful distinctions" between, on the one hand, component manufacturers and

suppliers and, on the other hand, manufacturers and distributors of complete products; for both groups, the "overriding policy considerations are the same." (*Kriegler v. Eichler Homes, Inc., supra,* 269 Cal.App.2d at p. 227.)

Defendant window manufacturers here argue that subjecting them to strict liability would be improper because they had no physical control over the windows at the time of the alleged harm. In support, they cite *Preston v. Goldman* (1986) 42 Cal.3d 108 [227 Cal.Rptr. 817, 720 P.2d 476]. But that case is distinguishable. At issue there was the negligence liability of a former landowner for a dangerous property condition that caused injury after the land was sold. (*Id.* at p. 110.) It did *not* involve strict liability for defects in mass-produced homes (*id.* at p. 117), which is at issue here. In any event, we have never held or implied that strict products liability applies only to those injuries that defective products cause while still under the manufacturer's ownership or control. Rarely, if ever, are defective products still in the control of a manufacturer, distributor, or retailer at the time of injury to the consumer. What matters is whether the windows were defective when they left the factory, and whether these alleged defects caused the injuries. (See *Wiler v. Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 629 [157 Cal.Rptr. 248]; Rest.3d Torts, Products Liability, § 5; *id.,* § 19, com. b, p. 268.)

Insisting that they should not be held strictly liable, defendant window manufacturers point out that their windows are shipped in parts, assembled by others, and installed by others. They rely on language in subdivision (1)(b) of section 402A of the Restatement Second of Torts. That subdivision says that the seller of a defective product "is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if [¶] . . . [¶] (b) *it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.*" (Italics added.) The mere assembly of a product that is sold in parts is not a "substantial change" in the product within the meaning of the Restatement. The issue is not whether the product was sold fully assembled or in parts, but rather whether the defect that resulted in the alleged damage existed when the windows left the manufacturers' control. To the extent defendants argue that any defect in their windows resulted from improper assembly or installation, their argument is not properly before us here. A motion for summary adjudication may be granted only if there is no triable issue of material fact. (Code Civ. Proc., § 437c, subd. (*o*)(1).) Defendants' motion for summary adjudication did not rely on a claim of improper assembly or installation.

Defendant window manufacturers argue that to subject them to strict liability would nullify the California Legislature's intent when it enacted

Code of Civil Procedure section 337.15. This statute requires that an action for damages based on latent deficiencies against any person "who develops real property or performs or furnishes the design, specifications, surveying, planning, supervision, testing, or observation of construction" be brought within 10 years after substantial completion of the development. (*Ibid.*) Defendants acknowledge that, as they are not developers, do not furnish designs or specifications, and do not supervise construction, the statute does *not* apply to them. Nevertheless, they assert that if they (or other component manufacturers in other lawsuits) are ultimately held strictly liable for defects in component parts of mass-produced homes, they might then seek equitable indemnity from developers or designers of the homes, thereby subjecting those developers or designers to liability for defects in their homes in suits brought after expiration of the 10-year statutory limitation period. We do not consider this argument because defendants did not raise it in the trial court, in the Court of Appeal, or in their petitions for review by this court.

Finally, defendant window manufacturers contend that applying strict liability to them would "open the litigation floodgates." They predict a massive increase in litigation as manufacturers and distributors of component products used in the mass production of homes bring actions and cross actions against each other for indemnity and other claims. We are not convinced. The same dire predictions were made in response to the original development of strict products liability. As we have explained, the policy reasons favoring strict products liability for component manufacturers are the same as for other participants in the general enterprise of manufacturing and marketing consumer goods, and these interests, including the incentives for improved product safety, outweigh the burden imposed by increased litigation.

Accordingly, we hold that the manufacturers of component parts, here windows, that are installed in mass-produced homes can be subject to strict products liability in tort when their defective products cause harm.[1] We now consider defendants' contention that the particular injuries for which plaintiffs here seek recovery are barred by the economic loss rule.

## IV.   THE ECONOMIC LOSS RULE

Two years after our 1963 decision in *Greenman, supra,* 59 Cal.2d 57, which held that manufacturers are strictly liable in tort for injuries that their defective products cause to consumers, we decided *Seely v. White Motor Co.*

---

[1] *La Jolla Village Homeowners' Assn. v. Superior Court, supra,* 212 Cal.App.3d 1131, and *Casey v. Overhead Door Corp., supra,* 74 Cal.App.4th 112, are disapproved to the extent they are inconsistent with the views expressed here.

(1965) 63 Cal.2d 9 [45 Cal.Rptr. 17, 403 P.2d 145] (*Seely*). In that case, the plaintiff purchased a truck for use in his business, but he discovered that the truck bounced violently, preventing normal use of the truck for his business. Eventually the truck overturned when its brakes failed. The plaintiff then sued the truck manufacturer to recover the cost of repairing the damage to the truck caused by the accident, the amount he had paid on the purchase price, and business profits he lost because of the truck's bouncing problem. (*Id.* at pp. 12-13.) The action was tried to the court, which found that the bouncing problem was a defect in the truck for which the manufacturer was responsible under its written warranty, but that this problem had not caused the accident in which the truck overturned. (*Id.* at p. 13.) The court awarded the plaintiff damages for breach of warranty, consisting of the amount paid on the purchase price of the truck and lost business profits attributable to the bouncing problem. (*Ibid.*)

The truck manufacturer appealed, and we affirmed the judgment. We rejected a contention that strict products liability had entirely superseded the law governing product warranties. We explained: "The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products." (*Seely, supra,* 63 Cal.2d at p. 18.) We concluded that the nature of this responsibility meant that a manufacturer could appropriately be held liable for physical injuries (including both personal injury and damage to property other than the product itself), regardless of the terms of any warranty. (*Id.* at pp. 18-19.) But the manufacturer could not be held liable for "the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands." (*Id.* at p. 18.)

This reasoning ultimately outlined the framework of our economic loss rule, which the United States Supreme Court later adopted in large part for purposes of tort liability under admiralty jurisdiction. (See *East River S.S. Corp. v. Transamerica Delaval* (1986) 476 U.S. 858, 871 [106 S.Ct. 2295, 2302, 90 L.Ed.2d 865].) As we stressed in *Seely,* recovery under the doctrine of strict liability is limited solely to "physical harm to person or property." (*Seely, supra,* 63 Cal.2d at p. 18.) Damages available under strict products liability do not include economic loss, which includes " ' "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—without any claim of personal injury or damages to other property . . . ." ' " (*Sacramento Regional Transit Dist. v. Grumman Flxible* (1984) 158 Cal.App.3d 289, 294 [204 Cal.Rptr. 736].)

Most recently, in *Aas v. Superior Court* (2000) 24 Cal.4th 627, 632 [101 Cal.Rptr.2d 718, 12 P.3d 1125], we applied the economic loss rule in a negligence action by homeowners against the developer, contractor, and subcontractors who built their dwellings. In *Aas*, the plaintiffs alleged that their homes suffered from many construction defects, but they conceded that many of the defects had caused no bodily injury or property damage. The trial court barred them from introducing evidence of the defects that had caused no injury to persons or property. We upheld the trial court's ruling. We explained that under the economic loss rule, "appreciable, nonspeculative, present injury is an essential element of a tort cause of action." (*Id.* at p. 646.) "Construction defects that have not ripened into property damage, or at least into involuntary out-of-pocket losses," we held, "do not comfortably fit the definition of ' "appreciable harm" '—an essential element of a negligence claim." (*Ibid.*)[2]

█ In summary, the economic loss rule allows a plaintiff to recover in strict products liability in tort when a product defect causes damage to "other property," that is, property *other than the product itself.* The law of contractual warranty governs damage to the product itself. (E.g., *Aas v. Superior Court, supra,* 24 Cal.4th at p. 639; *Seely, supra,* 63 Cal.2d at pp. 17-19; *Zamora v. Shell Oil Co.* (1997) 55 Cal.App.4th 204, 208-211 [63 Cal.Rptr.2d 762]; *San Francisco Unified School Dist. v. W.R. Grace & Co.* (1995) 37 Cal.App.4th 1318, 1327-1330 [44 Cal.Rptr.2d 305]; *Sacramento Regional Transit Dist. v. Grumman Flxible, supra,* 158 Cal.App.3d at pp. 293-298.)

To apply the economic loss rule, we must first determine what the product at issue is. Only then do we find out whether the injury is to the product itself (for which recovery is barred by the economic loss rule) or to property other than the defective product (for which plaintiffs may recover in tort). Defendant window manufacturers argue that here the "product" is the entire house in which their windows were installed, and that the damage caused to other parts of the house by the allegedly defective windows is damage to the product itself within the economic loss rule, thus precluding application of strict liability. We disagree.

California decisional law has long recognized that the economic loss rule does not necessarily bar recovery in tort for damage that a defective product (e.g., a window) causes to other portions of a larger product (e.g., a house) into which the former has been incorporated. In *Aas v. Superior Court, supra,* 24 Cal.4th at page 641, we observed that "the concept of recoverable

---

[2]In the wake of our decision in *Aas v. Superior Court, supra,* 24 Cal.4th 627, the Legislature established a limited new cause of action for certain specified housing defects. (Stats. 2002, ch. 722, § 3 [enacting new Civ. Code, § 895 et seq., eff. Jan. 1, 2003].)

physical injury or property damage" had over time "expanded to include damage to one part of a product caused by another, defective part." The list of examples we gave (*ibid.*) included *Stearman v. Centex Homes* (2000) 78 Cal.App.4th 611 [92 Cal.Rptr.2d 761], in which the Court of Appeal affirmed a judgment making a builder strictly liable in tort for damages that a defective foundation caused to the interior and exterior of a home. *Aas* also cited with approval the part of *Casey v. Overhead Door Corp., supra,* 74 Cal.App.4th 112, in which the Court of Appeal affirmed a nonsuit for the defendant on a tort claim for defective windows only because the plaintiffs had failed to prove that the windows damaged other property. The nonsuit would not have been proper, the Court of Appeal explained, had the plaintiffs been able to support their assertion that the windows had "caused damage to the drywall and framing and resulted in insect infestation and damage to personal property." (*Id.* at p. 123; see *Aas v. Superior Court, supra,* 24 Cal.4th at p. 641.) Defendants' argument here that the house is the relevant product for purposes of applying the economic loss rule is inconsistent with these and other decisions recognizing that the duty of a product manufacturer to prevent property damage does not necessarily end when the product is incorporated into a larger product.

Applying this principle to the facts before us here, we conclude that the manufacturer of a defective window installed in a mass-produced home may be held strictly liable in tort for damage that the window's defect causes to other parts of the home in which it is installed. We have no occasion here to consider whether defective raw materials should be treated in the same manner as component parts or whether there may be situations in which the economic loss rule would bar recovery for damages that a defective component part causes to other portions of the finished product of which it is a part. We hold only that, under California decisional law, the economic loss rule does not bar a homeowner's recovery in tort for damage that a defective window causes to other parts of the home in which it has been installed.

## V. PROPRIETY OF ORDER GRANTING SUMMARY ADJUDICATION

We now consider whether the trial court acted properly in granting the defense motion for summary adjudication. The court relied on *La Jolla Village, supra,* 212 Cal.App.3d 1131, and on *Casey v. Overhead Door Corp., supra,* 74 Cal.App.4th 112, both of which we have disapproved insofar as they hold or suggest that a manufacturer of components installed in a mass-produced home can never be strictly liable in tort for physical injuries caused by defects in those components. (See *ante,* fn. 1.) A motion for summary adjudication may be granted only if the moving party shows that a cause of action has no merit, that is, that there is no triable issue of material

fact as to the challenged cause of action. (Code Civ. Proc., § 437c, subds. (f)(1), (o)(1).) Here, the record does not demonstrate as a matter of law that defendant window manufacturers may not be held strictly liable in tort for the alleged damages to parts of the homes other than the windows themselves.

CONCLUSION AND DISPOSITION

This court assumed a leading role in holding manufacturers, distributors, and retailers of defective products strictly liable for physical injuries resulting from the defects. We imposed this strict liability to assure just compensation to innocent victims, to give all those in the distributive chain an incentive to improve product safety and performance, and to promote equitable spreading and apportionment of the losses resulting from physical injuries as a cost of doing business. These policy considerations support the conclusions we reach here: to impose strict liability on the manufacturers of windows installed in mass-produced homes for physical injuries caused by defects in those windows, and to include within the scope of this strict liability damage to other parts of the houses in which these defective windows are installed.

The judgment of the Court of Appeal is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**KENNARD, J.,** Concurring.—The majority opinion, which I authored, holds that the economic loss rule does not bar recovery for damages that defective windows cause to other components of mass-produced homes in which they are installed. (Maj. opn., *ante*, at p. 484.) It does not hold, however, that the economic loss rule can never bar recovery for damages that one part or element of a finished product causes to other parts or elements of the same finished product. I write separately to express and explain my view that the crucial inquiry for applying the economic loss rule in this context is whether the component part has been so integrated into the overall unit that it has lost its separate identity.

The economic loss rule limits tort recovery under strict products liability to damages for physical harm to a person or to property other than the defective product itself. (Maj. opn., *ante*, at p. 483.) To apply the economic loss rule, therefore, one must first determine what the product at issue is. Only then can one determine whether the injury is to the product itself (and therefore subject to the economic loss rule) or to property other than the

defective product (and thus subject to strict products liability in tort). Here, defendant window manufacturers have argued that the "product" is the entire house in which their windows were installed, and that the damage caused to other parts of the house by the allegedly defective windows is damage to the product itself within the economic loss rule, thus precluding application of strict liability. For the reasons that follow, I conclude that the windows may be regarded as a distinct product for purposes of the economic loss rule.

The manufacturer of a component part may be strictly liable in tort for physical injuries caused by defects in the component. As the Restatement Third of Torts recognizes: "One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if: [¶] (a) the component is defective in itself . . . and the defect causes the harm . . . ." (Rest.3d Torts, Products Liability, § 5.) A comment in the Restatement Third of Torts addresses the issue of a component causing damage to the product of which it is a part. It says: "[W]hen a component part of a machine or a system destroys the rest of the machine or system, the characterization process becomes more difficult. When the product or system is deemed to be an integrated whole, courts treat such damage as harm to the product itself. When so characterized, the damage is excluded from the coverage of this Restatement. A contrary holding would require a finding of property damage in virtually every case in which a product harms itself and would prevent contractual rules from serving their legitimate function in governing commercial transactions." (Rest.3d Torts, Products Liability, § 21, com. e, pp. 295-296.) Under the Restatement view, in other words, the manufacturer of component will not be strictly liable in tort for injury to other parts of the unit in which it is installed if the component has been so integrated into the overall unit that it has lost its separate identity.

Instructive here is the United States Supreme Court's decision in *East River S.S. Corp. v. Transamerica Delaval* (1986) 476 U.S. 858 [106 S.Ct. 2295, 90 L.Ed.2d 865]. There, companies that chartered oil-transporting supertankers brought an action under maritime law seeking to hold a turbine manufacturer strictly liable in tort for income losses and repair costs resulting when a defective part of the supertankers' turbines damaged other parts of the turbines. (*Id.* at pp. 859-860 [106 S.Ct. at p. 2296].) Adopting an economic loss rule similar to the one this court had articulated in *Seely v. White Motor Co.* (1965) 63 Cal.2d 9 [45 Cal.Rptr. 17, 403 P.2d 145], the high court held that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." (*East River*, at p. 871 [106 S.Ct. at p. 2307], fn.

omitted.) The court determined that the defective part of the turbine had been so integrated into the turbine that it lost its separate identity, and thus the manufacturer was not strictly liable in tort for injury that the component part caused to the turbine. The court reasoned that "each turbine was supplied by [the turbine designer, manufacturer, and installer] as an integrated package [and] each is properly regarded as a single unit." (*Id.* at p. 867 [106 S.Ct. at p. 2300].) Thus, the high court in *East River* determined, consistent with the Restatement Third of Torts, Products Liability, that the defective part had been so integrated into the turbine that it could not be regarded as a separate product.

Thereafter, the United States Supreme Court in *Saratoga Fishing Co. v. J.M. Martinac & Co.* (1997) 520 U.S. 875 [117 S.Ct. 1783, 138 L.Ed.2d 76], addressed a related, yet distinguishable, issue in the context of equipment added to a ship *after* it had been originally built and outfitted. In *Saratoga,* the court considered whether a skiff, a net, and various spare parts added to a ship after its original sale were "other property"—that is, property other than the ship itself—so as to allow a second purchaser of the ship to recover in tort from the manufacturer for the loss of these items when the ship caught fire and sank. (*Id.* at p. 877 [117 S.Ct. at p. 1785].) The court allowed recovery because the extra equipment was "other property." The court noted that the ship as originally outfitted, without the extra equipment, was the product that was "placed in the stream of commerce by the manufacturer and its distributors." (*Id.* at p. 883 [117 S.Ct. at p. 1788].) The high court's decision is consistent with the view that a nonintegrated component may be a separate product for purposes of strict products liability law. The extra equipment at issue in *Saratoga* had not been so integrated into the ship that it lost its separate identity.

I would adopt for California the interpretation of the economic loss rule articulated in these two decisions of the United States Supreme Court and in the Restatement Third of Tort, discussed above. Under this interpretation, in determining whether a component manufacturer is strictly liable in tort for harm that its defective product causes to a larger object of which it is a component, the pertinent inquiry is whether the component has been so integrated into the larger unit as to have lost its separate identity. If so, strict liability is improper. But if the component retains its separate identity, so that it may be readily separated from the overall unit, the component manufacturer may be strictly liable for damages to the larger unit.

Windows are not so integrated into houses as to lose their separate identity. Windows can be readily removed from houses and replaced with other windows. A window that has been removed from one house can then

be installed in another house. For this reason, I conclude that a window manufacturer is strictly liable in tort for damages that defects in its windows cause to other parts of the homes, such as stucco, insulation, framing, drywall, and baseboards.

**BROWN, J.** Concurring and Dissenting.—In a single paragraph and without significant analysis (maj. opn., *ante*, at p. 484), the majority sharply narrows the economic loss rule and thereby substantially erodes the demarcation between contract and tort law in California. Plaintiffs allege they bought a product (a mass-produced home) that included defective components (the windows), which malfunctioned, damaging the product as a whole but otherwise causing no personal injury or property damage. In short, plaintiffs claim they did not get the full benefit of their bargain because the product they bought deteriorated in value due to the malfunctioning of a component. The case raises no issue of public safety, nor does it involve an injury that exceeds the subject matter of the parties' bargain. As such, it is a purely commercial dispute involving failure to deliver bargained-for value (monetary harm) and dependent for its resolution on the terms of the parties' agreement. Plaintiffs have not shown that traditional warranty principles are somehow inadequate to provide redress for the harm at issue here. Nevertheless, the majority permits a strict products liability action without discussing why a tort remedy is appropriate in this context.

In a world full of complex, integrated products, the general malfunction of a product is almost always traceable to the malfunctioning of a component. Therefore, the majority's rule turns virtually every product failure into a tort. Because this ill-considered abandonment of settled principles is wrong and fraught with potentially far-reaching consequences, I dissent.[1]

I.

The acknowledged genesis of strict products liability in California is Justice Traynor's concurring opinion in *Escola v. Coca Cola Bottling Co., supra,* 24 Cal.2d at pages 461-468 (conc. opn. of Traynor, J.) (*Escola*), which the court adopted in *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049] (*Greenman*): "A manufacturer is strictly liable in tort when an article he places on

---

[1]Although the majority's analysis of whether component manufacturers can *ever* be subject to strict products liability comprises the greater portion of its discussion, that proposition is, in fact, a question on which the law appears substantially settled; and I do not take issue with that aspect of the opinion. Indeed, Justice Traynor's concurring opinion in *Escola v. Coca Cola Bottling Co.* (1944) 24 Cal.2d 453 [150 P.2d 436] anticipated such a rule (see *id.* at p. 462), which the Restatement of Torts now considers an established proposition. (See Rest.3d Torts, Products Liability, § 19, com. b, p. 268.)

the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." "The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Id.* at p. 63.) Thus, "[e]ven if there is no negligence [on the part of the manufacturer], public policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." (*Escola*, at p. 462 (conc. opn. of Traynor, J.).)

The court's concern was thus to maximize consumer safety (see *Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256, 262 [37 Cal.Rptr. 896, 391 P.2d 168]; see also *Escola, supra,* 24 Cal.2d at p. 462) and to fill a gap in warranty law that effectively left no recourse to an individual injured by a defective product. " 'The remedies of injured consumers ought not to be made to depend upon the intricacies of the law of sales.' [Citation.]" (*Greenman, supra,* 59 Cal.2d at p. 64.) "Sales warranties serve this purpose fitfully at best. [Citation.]" (*Id.* at pp. 63-64; see also *Seely v. White Motor Co.* (1965) 63 Cal.2d 9, 15-16 [45 Cal.Rptr. 17, 403 P.2d 145] (*Seely*).) And, as the high court noted in *East River S.S. Corp. v. Transamerica Delaval* (1986) 476 U.S. 858, 867 [106 S.Ct. 2295, 2300, 90 L.Ed.2d 865] (*East River*), "[f]or similar reasons of safety, the manufacturer's duty of care was broadened to include protection against property damage." When a defective product malfunctions and causes damage to other property, safety concerns are implicated because of the very real possibility that the same malfunction might easily have caused a personal injury. "Physical injury to property is so akin to personal injury that there is no reason to distinguish them. [Citations.]" (*Seely*, at p. 19.)

But imposition of strict products liability for damage a defective component of a product causes to the product itself cannot be brought within the foregoing rationale. Here, plaintiffs complain solely of damage to their house, that is, to the product they originally purchased; the safety of their person and other property has never been at issue. That circumstance takes this case outside the scope of strict products liability. The concern driving strict products liability law is that "[a] consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market." (*Seely, supra,* 63 Cal.2d at p. 18.) This concern does not arise when the product *itself* suffers damage, whether or not caused by a component. In that case, a different rule applies; that is, a consumer "can . . . be fairly charged with the risk that the product will not match his economic expectations." (*Ibid.*)

## II.

When no safety concerns are implicated because the damage is limited to the product itself, the consumer's recourse is in contract law to enforce the benefit of the bargain. This principle underlies the economic loss rule, a rule that distinguishes between damages from *physical injuries* caused by a defective product and *economic losses* resulting from the failure of the product to meet the consumer's expectations (for example, losses in a business or the diminished value of the product). The acknowledged seminal articulation of this rule is Chief Justice Traynor's opinion in *Seely, supra,* 63 Cal.2d 9 (see *East River, supra,* 476 U.S. at p. 868 [106 S.Ct. at pp. 2300-2301]; *Aas v. Superior Court* (2000) 24 Cal.4th 627, 639-640 [101 Cal.Rptr.2d 718, 12 P.3d 1125] *(Aas)*; *Stearman v. Centex Homes* (2000) 78 Cal.App.4th 611, 616 [92 Cal.Rptr.2d 761] *(Stearman)*; see also Rest.3d Torts, Products Liability, § 21, com. c, pp. 293-294): "The law of sales has been carefully articulated to govern the *economic relations between suppliers and consumers of goods.* The history of the doctrine of strict liability in tort indicates that it was designed, not to undermine the warranty provisions of the sales act or of the Uniform Commercial Code but, rather, to govern *the distinct problem of physical injuries.*" *(Seely,* at p. 15, italics added.) "Although the rules of warranty frustrate rational compensation for physical injury, *they function well in a commercial setting.* [Citations.] These rules determine the quality of the product the manufacturer promises and thereby determine the quality he must deliver." *(Id.* at p. 16, italics added.)

"The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. *He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands.*" *(Seely, supra,* 63 Cal.2d at p. 18, italics added; see *Aas, supra,* 24 Cal.4th at p. 642; *East River, supra,* 476 U.S. at p. 873 [106 S.Ct. at p. 2303].)

The court also emphasized the appropriateness of bargained-for limitations of liability when a product simply malfunctions, or functions below expectations, but causes no personal injury or damage to other property. The court noted that, because strict products liability "prevent[s] a manufacturer from defining the scope of his responsibility for harm caused by his products," its application in the case of a product that merely performs below

expectations would make "[t]he manufacturer . . . liable for damages of unknown and unlimited scope. Application of the rules of warranty prevents this result." (*Seely, supra,* 63 Cal.2d at p. 17; see *East River, supra,* 476 U.S. at p. 874 [106 S.Ct. at pp. 2303-2304].)

The court made equally clear its decision did not depend on the relative bargaining power of the parties. "The law of warranty is not limited to parties in a somewhat equal bargaining position. Such a limitation is not supported by the language and history of the sales act and is unworkable. Moreover, it finds no support in *Greenman*. The rationale of that case does not rest on the analysis of the financial strength or bargaining power of the parties to the particular action. It rests, rather, on the proposition that 'The cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business.' [Citation.] That rationale *in no way justifies requiring the consuming public to pay more for their products so that a manufacturer can insure against the possibility that some of his products will not meet the business needs of some of his customers.*" (*Seely, supra,* 63 Cal.2d at pp. 18-19, italics added; see *East River, supra,* 476 U.S. at p. 872 [106 S.Ct. at pp. 2302-2303].)

The majority offers no reasoned explanation for ignoring the foregoing principles here where the cause of the product's failure to meet expectations is that a defective component in the product has damaged the product. In other words, how does the fact that a product somehow damages itself bar invocation of the economic loss rule? The simple answer is that it does not, as the United States Supreme Court has explained in *East River, supra,* 476 U.S. 858. (See *Saratoga Fishing Co. v. J.M. Martinac & Co.* (1997) 520 U.S. 875 [117 S.Ct. 1783, 138 L.Ed.2d 76] (*Saratoga Fishing*); *Seely, supra,* 63 Cal.2d at pp. 16-17.)[2]

### III.

In *East River*, components of supertanker turbine engines failed, causing damage—but only to the engines themselves, i.e., "purely monetary harm." (*East River, supra,* 476 U.S. at p. 868 [106 S.Ct. at p. 2301].) Relying substantially on the reasoning in *Seely, supra,* 63 Cal.2d 9, which it characterized as defining "one end of the spectrum" (*East River*, at p. 868 [106

---

[2]The fact that a component may be defined as a "product" for purposes of imposing strict products liability when its defective condition causes personal injury or damage to other property (see Rest.3d Torts, Products Liability, § 19, com. b, p. 268) is irrelevant here where the only damage is to the product itself. Under established principles, imposition of strict liability is appropriate in the former circumstances to preclude component manufacturers from avoiding responsibility for the harm caused by their defective products.

S.Ct. at pp. 2300-2301]), and rejecting any compromise of the economic loss rule tolerated by the "minority" and "intermediate" views, the high court held that the plaintiffs could not recover damages in strict liability. (*East River*, at p. 870 [106 S.Ct. at pp. 2301-2302].) "Since each turbine was supplied by [defendant] as an integrated package [citation], each is properly regarded as a single unit. 'Since all but the very simplest of machines have component parts, [a contrary] holding would require a finding of "property damage" [triggering strict products liability] in virtually every case where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability.'. . . Obviously, damage to a product itself has certain attributes of a products-liability claim. But the injury suffered—the failure of the product to function properly—is the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain." (*Id.* at pp. 867-868 [106 S.Ct. at p. 2300].) Regardless of the manner in which the harm occurs, "the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law. [Citation.] [¶] . . . The minority view fails to account for the need to keep products liability and contract law in separate spheres and to maintain a realistic limitation on damages." (*Id.* at pp. 870-871 [106 S.Ct. at p. 2302].)

Equally important, "[w]hen a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong. [¶] The tort concern with safety is reduced when an injury is only to the product itself. When a person is injured, the 'cost of an injury and the loss of time or health may be an overwhelming misfortune,' and one the person is not prepared to meet. [Citation.]" (*East River, supra*, 476 U.S. at p. 871 [106 S.Ct. at p. 2302].) By contrast, one can readily insure against economic losses or recover them in warranty. (*Id.* at pp. 871, 873-874 [106 S.Ct. at pp. 2302, 2303].) Accordingly, "[s]ociety need not presume that a customer needs special protection. The increased cost to the public that would result from holding a [component] manufacturer liable in tort for injury to the product itself is not justified. [Citation.]" (*Id.* at p. 872 [106 S.Ct. at p. 2302]; see *Seely, supra*, 63 Cal.2d at p. 19.)

The United States Supreme Court further noted that the more circumscribed scope of foreseeability in contract law imposes an additional necessary limit on liability in this context. (*East River, supra*, 476 U.S. at p. 874 [106 S.Ct. at pp. 2303-2304].) By contrast in strict products liability, "where there is a duty to the public generally, [and hence foreseeability is construed more broadly,] foreseeability is an inadequate brake. [Citations.] Permitting recovery for all foreseeable claims for purely economic loss could make a manufacturer liable for vast sums." (*Ibid.*)

The high court reiterated these principles in *Saratoga Fishing* and explained that "[w]hen a manufacturer places an item in the stream of commerce by selling it to an Initial User, that item is the 'product itself' under *East River*." (*Saratoga Fishing, supra,* 520 U.S. at p. 879 [117 S.Ct. at p. 1786].) "Items added to the product by the Initial [or a subsequent] User are therefore 'other property,'" which, if damaged, could trigger strict products liability. (*Ibid.*)

The court thus articulated a "product sold" test for determining what constitutes damage to the product and what constitutes damage to other property. This test harmonizes principles underlying both the economic loss rule and strict products liability, preventing the latter from subsuming the former. As noted in *East River,* "preserving a proper role for the law of warranty precludes imposing tort liability if a defective product causes purely monetary harm," as occurs when a defect in the product damages the product itself, and thereby diminishes its value, but causes no other damage. (*East River, supra,* 476 U.S. at p. 868 [106 S.Ct. at pp. 2300-2301]; see *Aas, supra,* 24 Cal.4th at p. 640; *Stearman, supra,* 78 Cal.App.4th at p. 616.)

## IV.

The majority fails even to recognize, much less resolve on any principled basis, the tension generated by resorting to strict products liability despite the adequacy of alternative remedies[3] and the total absence of safety concerns. Instead, it sidesteps the difficulty by relying on two Court Appeal decisions: *Casey v. Overhead Door Corp.* (1999) 74 Cal.App.4th 112 [87 Cal.Rptr.2d 603] (*Casey*) and *Stearman, supra,* 78 Cal.App.4th 611. Noting that we mentioned the holdings of these cases in *Aas, supra,* 24 Cal.4th 627, the majority asserts that, under "long recognized" California law, the economic loss rule does not necessarily bar recovery for physical damage to a product caused by a defective component. (See maj. opn., *ante,* at p. 484.) With all due respect to the Courts of Appeal, it is not this court's role to blandly default to their decisions without a searching analysis. (Cf. *Cronin v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 130-135 [104 Cal.Rptr. 433, 501 P.2d 1153] [discussing at length whether California products liability law includes "unreasonably dangerous" requirement imposed under Rest.2d Torts, § 402A].) The crucial point is that, whatever else they say, the courts in *Casey* and *Stearman* failed to consider whether the facts of those cases implicated the consumer safety rationale of strict products liability and

---

[3]Such remedies are rooted in the general law of sales and in special statutory provisions governing home sales. We note in this regard that the Legislature has not failed to enact special protections for the purchasers of homes. (See, e.g., Stats. 2002, ch. 722, § 3 [enacting new Civ. Code, § 895 et seq., eff. Jan. 1, 2003].)

justified applying tort law rather than warranty law. Since neither decision addressed these issues, they cannot be read as support, and certainly not dispositive support, for rejecting the economic loss rule in this context.[4]

The problem in particular with the analysis in *Stearman*, which the majority implicitly and uncritically accepts, is that the Court of Appeal misconceived the driving principle underlying the economic loss rule. "The economic loss doctrine marks the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others." (Barrett, *Recovery of Economic Loss in Tort for Construction Defects: A Critical Analysis* (1989) 40 S.C. L.Rev. 891, 894.) As the Nevada Supreme Court explained when it addressed the question of recovery for water damage caused to homes by defective roofing and siding: "Contract law is designed to enforce the expectancy interests created by agreement between the parties and seeks to enforce standards of *quality*. 'This standard of quality must be defined by reference to that which the parties have agreed upon.' [Citation.] In contrast, tort law is designed to secure the protection of all citizens from the danger of physical harm to their persons or to their property and seeks to enforce standards of *conduct*. These standards are imposed by society, without regard to any agreement. Tort law has not traditionally protected strictly economic interests related to product quality—in other words, courts have generally refused to create a duty in tort to prevent such economic losses. [Citation.]" (*Calloway v. City of Reno* (2000) 116 Nev. 250 [993 P.2d 1259, 1265-1266] (*Calloway*).) Accordingly, "the economic loss doctrine serves to define the scope of duty and 'shield[s] a defendant from unlimited liability for all of the economic consequences of a negligent act, particularly in a commercial or professional setting, and thus . . . keep[s] the risk of liability reasonably calculable.' [Citation.]" (*Id.* at p. 1266.)

The Nevada high court noted that Florida's supreme court had reached a similar conclusion in the present context: " 'Buying a house is the largest investment many consumers ever make, and homeowners are an appealing, sympathetic class. If a house causes economic disappointment by not meeting a purchaser's expectations, the resulting failure to receive the benefit of the bargain is a core concern of contract, not tort, law. There are protections

---

[4]*Stearman* notes that some Court of Appeal decisions rely on cryptic dicta in the last paragraph of *Seely* suggesting, without explanation, that the plaintiff in that case might have recovered in strict products liability if he had established causation. (*Seely, supra*, 63 Cal.2d at p. 19; see *Stearman, supra*, 78 Cal.App.4th at p. 617.) Other decisions "apparently *assumed* physical damages were recoverable." (*Stearman*, at p. 622.) Clearly the Court of Appeal was attempting to identify some coherent principle among these cases. Its inability to do so highlights the need for a thorough and well-reasoned analysis by this court.

for homebuyers, however, such as statutory warranties, the general warranty of habitability, and the duty of sellers to disclose defects, as well as the ability of purchasers to inspect houses for defects. Coupled with homebuyers' power to bargain over price, these protections must be viewed as sufficient when compared with the mischief that could be caused by allowing tort recovery for purely economic losses.' [Citation.]" (*Calloway, supra,* 993 P.2d at p. 1266, quoting *Casa Clara v. Charley Toppino and Sons* (Fla. 1993) 620 So.2d 1244, 1247.)

Here, as in *Calloway,* the allegedly defective windows were "an integral component" of plaintiffs' homes. (*Calloway, supra,* 993 P.2d at p. 1269.) "The damage caused by the allegedly defective [windows] therefore constituted damage to the structures themselves—no 'other' property damage resulted, and [plaintiffs] suffered purely economic losses. Because of the alleged construction defects [plaintiffs] failed to receive the benefit of their bargains; the defects resulted in a lower standard of quality than that expected. Such inferior workmanship, which leads to building deterioration, is not properly addressed by tort law. [Citation.] In such circumstances, the overriding policy of tort law, to promote safety, is not implicated. We therefore discern no reason to impose, in tort law, a general societal duty to prevent such economic losses." (*Ibid.*)

The majority proffers no rationale—in terms of either strict products liability or the economic loss rule—for rejecting the reasoning of *East River, Calloway,* and other decisions (from a majority of jurisdictions that have addressed the issue) barring tort recovery for home damage caused by defective parts. (See *Calloway, supra,* 993 P.2d at p. 1268, and cases cited therein.) Admittedly, the issues are complex, but we are not without a solid analytical framework. "[T]he more reasoned method of analyzing the economic loss doctrine is to examine the relevant policies in order to ascertain the proper boundary between the distinct civil law duties that exist separately in contract and tort. . . . [P]ermitting tort recovery for economic losses from construction defects would create a general, societally imposed duty on the part of builders and developers to avoid such losses. These losses are not properly addressed by tort law, which has as its underlying policy the promotion of safety. Instead, such harm is paradigmatically addressed by the policies underlying contract law—to enforce standards of quality as defined by the parties' contractual relationships." (*Id.* at p. 1266, fn. 3.) Rather than such analysis, however, we are simply given ipse dixit conclusions.

The majority's holding not only eviscerates the economic loss rule (see *East River, supra,* 476 U.S. at p. 867 [106 S.Ct. at p. 2300]) but poses

considerable problems of principled application. Will all defective constituent parts support an action in strict products liability if they damage the product sold? If not, how are courts to draw a meaningful line?[5] I agree with the Nevada Supreme Court that "any attempt to exempt a certain type of case from the [economic loss] doctrine's application, without analyzing the policy rationales underlying the doctrine, and without considering the very real distinctions between the policies governing recovery in contract and tort, necessarily shifts the focus to a particular plaintiff or group of plaintiffs. Such an approach undermines the very purpose of the economic loss doctrine—to provide a boundary between contract law and tort law—and results in outcome-determinative decisions that may have no analytical consistency. Such decision making will inevitably blur and potentially destroy the distinctions between these two fundamentally different civil remedies." (*Calloway*, *supra*, 993 P.2d at p. 1266, fn. 3; see *East River*, *supra*, 476 U.S. at p. 875 [106 S.Ct. at p.. 2304].)

Unlike the majority's rule, a "product sold" test can be readily applied not only in this case but in any circumstance where a component of a product damages the product itself. Here, plaintiffs bought their homes as single, integrated products complete with windows and other constituent parts one would expect in a home. They allege the windows were defective and caused damage to the other parts of their homes, but plaintiffs suffered no personal injury from these defects, nor was any property, other than the homes themselves, damaged. In other words, the product they bought—their homes—did not meet the quality standard they expected at the time of purchase. In those circumstances, the economic loss rule limits their recovery to the benefit of their bargain. If for some reason, such as a limited warranty, they find their contractual remedies inadequate, that fact is a function of their bargain with the seller; it is not a loss the general public should have to subsidize. (See *Seely*, *supra*, 63 Cal.2d at p. 19.)

The petition of real party in interest Viking Industries, Inc., for a rehearing was denied January 22, 2003. Brown, J., was of the opinion that the petition should be granted.

---

[5]The majority purports to reserve the question whether raw materials come within its holding. (See maj. opn., *ante*, at p. 484.) Given the Restatement's definition of "product," however (see Rest.3d Torts, Products Liability, § 19, com. b, p. 268), it is unclear by what principle raw materials could be excluded.