129 Cal.Rptr.2d 682 (2003)
105 Cal.App.4th 749
ROBINSON HELICOPTER COMPANY, INC., Plaintiff and Respondent,
v.
DANA CORPORATION, Defendant and Appellant.
No. B150963.
Court of Appeal, Second District, Division Three.
January 24, 2003.
Rehearing Denied February 21, 2003.
Review Granted May 14, 2003.
*684 Howrey Simon Arnold & White, LLP, Edwin V. Woodsome, Jr., David G. Meyer and Michael L. Resch, Los Angeles; Bowman and Brooke, LLP and Lawrence R. Ramsey, Torrance; Cardelli, Hebert & Lanfear, PC and Thomas G. Cardelli for Defendant and Appellant.
Tim A. Goetz, Torrance; Waller Lansden Dortch & Davis and Raymond E. Hane, III, Los Angeles; Edward J. Horowitz, PC, Los Angeles, for Plaintiff and Respondent.
*683 CROSKEY, J.
Dana Corporation (Dana)[1] appeals from a judgment in the sum of $7,533,924 (including $6 million in punitive damages) entered against it following a jury trial. This case arose out of a contract between Dana and the respondent, Robinson Helicopter Company, Inc. (Robinson), pursuant to which Dana manufactured and sold sprag clutches for use in the helicopters manufactured by Robinson. After a nine-day trial, the jury found Dana liable for breach of contract, breach of warranty and intentional fraud.
The principal issue presented involves the application of the economic loss rule. That rule precludes a recovery in tort where the sale of a defective product has resulted in no property damage or bodily injury, but only economic loss to the buyer of that product. In California, the rule has operated to preclude a tort recovery by the purchaser of a defective product under either negligence or product liability theories. As we explain, the rule also should be applied to intentional fraud cases where such fraud has been committed in the performance, as opposed to the inducement, of the product sale contract.
Dana argues that the trial court improperly permitted a relatively simple claim for breach of a commercial sales contract and warranty to be transformed into an action for fraud, thus justifying an award of punitive damages. We have carefully reviewed this record and find that we agree with Dana. In breaching its contract with Robinson, Dana did not commit an independent tortious act. At most, it fraudulently concealed its acts of breach from Robinson. However, because this did not result in any additional damage to Robinson nor any detrimental reliance, the economic loss rule is properly applied to restrict Robinson's recovery to contract damages.
No legal or factual basis existed for the submission of fraud and punitive damage issues to the jury. Therefore, this case should have been limited to contract and warranty claims. With respect to those claims, the record fully supports the jury's verdict. We therefore will reverse the *685 judgment to the extent that it is based on a finding of fraud and awards punitive damages, but we will affirm the portion of the judgment that awards damages for breach of contract and warranty.

FACTUAL AND PROCEDURAL BACKGROUND[2]
Robinson is a manufacturer of helicopters. Its R22 model is a two seat helicopter used as a primary trainer for pilots. The R44 model is a heavier model used for a wide variety of purposes. Both of these models use sprag clutches manufactured by Dana's Formsprag division. The sprag clutch on a helicopter functions like the "free wheeling" clutch mechanism on a bicycle where the rider transmits power to the rear wheel by operating the pedals, but when the rider stops pedaling, the wheel continues to rotate. A sprag clutch is primarily a safety mechanism. If a helicopter loses power during flight, the sprag clutch allows the rotor blades to continue turning and permits the pilot to maintain control and land safely by the "autorotating" of the rotor blades.[3]
Dana is one of nearly 1,000 vendors from which Robinson purchases parts for its R22 and R44 helicopters. Each vendor has its own quotation form with additional terms and conditions printed on the reverse side of the form.[4] Generally, however, Robinson received quotations from vendors by facsimile transmission. These copies did not include the reverse side of the original document. Thus, absent other evidence that Robinson was aware of, and had agreed to, the terms and conditions of a quotation offer that were printed on the reverse side of the original document, it would be difficult to conclude that the agreement between Robinson and the offering party would include those terms and conditions. At all relevant times, Dana's Formsprag division was the only manufacturer of the sprag clutches that Robinson required for its R22 and R44 helicopters.
All aircraft manufacturers in the United States, including Robinson, must obtain a *686 "type certificate" from the Federal Aviation Administration). The type certificate freezes the design as of the date the certificate is issued. Every aircraft made pursuant to the certificate must be produced exactly in accordance with that certificate. Any proposed changes must first be submitted to and approved by the FAA. The components of the sprag clutch must be ground to precise tolerances, measured in thousandths of an inch, to avoid distortions that lead to cracking and failure. Pursuant to the type certificate issued to Robinson by the FAA for the R22 and R44 models, the parts of the sprag clutches, including the sprag ears, were required to be ground at a particular level of hardness to assure their metallurgical integrity. The required level of hardness of the R22 and the R44 clutches, pursuant to the type certificates, was described as "50/55 Rockwell" (50/55).
Between 1984 and July 1996, Robinson purchased 3,707 sprag clutches from Dana. Each was ground to the required % level of hardness. There were only three incidents of cracking or failure of these sprag ears, a rate of 0.03%. In July 1996, Dana changed its grinding process to a higher, "61/63 Rockwell" (61/63) level of hardness. Dana did not notify Robinson or the FAA of this change.[5] After such change was made in the grinding process, Dana nonetheless continued to provide written certificates to Robinson with each delivery of clutches that the clutches had been manufactured in conformance with Robinson's written specifications (which specifications prohibited unapproved changes in Dana's manufacturing process).[6]
In October 1997, again without notifying either Robinson or the FAA, Dana changed its grinding process back to the 50/55 level of hardness that was required by its contract with Robinson. Beginning in early 1998, the sprag clutch ears that had been ground at the 61/63 level of hardness and sold to Robinson experienced a failure rate of 9.86%.[7] This compared with a failure rate for clutches manufactured before July 1996 of 0.03% and 00.0% for clutches manufactured after October 1997.
Between August 24, 1998 and November 30, 1998, Robinson sent several letters to Dana reporting that eleven clutch assemblies with cracked sprags had been returned to Robinson from its operator customers. Each of these assemblies was ultimately traced to serial numbers of Dana sprag clutches that had been sold to *687 Robinson during the period that Dana was grinding the clutches to the higher 61/63 level of hardness. On November 30, 1998, during a conference call between Robinson and Dana officials, Dana disclosed, for the first time, that it had used the 61/63 hardness level in its manufacturing process during the period July 1996 to October 1997.
Although it was a disputed issue, the record reflects that substantial evidence was presented at trial demonstrating that the higher failure rate of Dana's sprag clutches manufactured during the July 1996 to October 1997 period was due to the higher hardness level to which they had been ground. Fortunately, these clutch failures did not result in any helicopter accident and there were no incidents of injury or property damage that were caused by any clutch defect or failure, nor did any of the defective clutches cause any damage to other parts of the helicopters in which they had been installed.
Nonetheless, Robinson was ultimately required by the FAA and its British equivalent, the Air Accidents Investigation Branch of the United Kingdom's Department of Transport (AAIB), to recall and replace all of the faulty clutch assemblies (i.e., those manufactured with Dana's sprag clutches ground to the higher hardness level of 61/63 rather than the 50/55 level required by the Robinson specifications). This led to a total claimed expense to Robinson of $1,555,924, which represented the cost of (1) replacement parts, and (2) substantial employee time spent investigating the cause of the malfunctioning parts and the identification and replacement of parts on helicopters that had already been sold to customers.
There were approximately 990 sprag clutches that were ultimately identified as having been manufactured at the higher nonconforming level of hardness. It was important to Robinson that the defective clutches be identified as soon as possible so that it could effect full replacements before any accident might occur. Although Dana had disclosed on November 30, 1998, that it had previously changed the hardness level, it did not provide Robinson with the necessary serial and lot number information until February 12, 1999, despite repeated demands therefor.[8]
When this information was finally provided and Robinson was able to identify the clutch assemblies that had to be replaced, it submitted the necessary orders to Dana,[9] together with a request that the issue as to which party would bear the cost of such replacement parts be left for later determination. Dana, however, disputed any liability, and, in fact, claimed that Robinson's problems were due to its own inadequate designs that placed too much stress on the clutch assemblies. Dana refused to ship any new clutches except on a COD or other assured payment basis.
*688 Having no alternative, Robinson went forward, incurred the costs described above, purchased the new clutches, and effected the necessary replacements. It then filed this action alleging causes of action for breach of contract, breach of warranty and negligent and intentional misrepresentations. After a nine-day trial, the jury returned a verdict in favor of Robinson for $1,533,924 in compensatory damages and $6 million in punitive damages. The jury found that Dana had not only breached its contract with Robinson and the warranties made thereunder, but also had made false misrepresentations of fact and had knowingly misrepresented or concealed material facts with the intent to defraud. The award of punitive damages was based on this latter finding.
The trial court denied Dana's motions for new trial and judgment notwithstanding the verdict. Dana has filed this timely appeal.

CONTENTIONS
Dana essentially argues that this was a contract dispute and that Robinson's tort claims should never have been submitted to the jury. Dana contends that the economic loss rule applies to fraud cases and precludes any tort recovery in the absence of injury or property damage. It further argues that even if a fraud claim were permitted, there is no evidence of detrimental reliance by Robinson nor any evidence demonstrating that Robinson sustained any damages not attributable to Dana's breaches of contract and warranty.
Dana's second principal argument relates to the jury's finding of contract liability. Dana contends that the terms of its agreement with Robinson permitted the change in its manufacturing process and Robinson is bound thereby and thus it was error to permit the jury to otherwise construe and apply the contractual terms.[10] The most the jury should have been asked to resolve was the dispute as to whether Robinson had received, accepted or agreed to the contract terms (set out on the reverse side of the Dana purchase order).[11]
Dana also urges upon us a number of claimed evidentiary and instructional errors. Because we agree with Dana's first argument as to the application and effect of the economic loss rule, but conclude that the record fully supports the jury's determination of contract liability, we need not reach nor address the other issues argued by the parties.

DISCUSSION

1. Standard of Review

We view the evidence presented at trial in the light most favorable to the judgment. In this case, the jury implicitly found that a contract existed between Dana and Robinson that included the requirement that Dana manufacture the sprag clutches in a particular way and *689 certify such manufacturing compliance; the jury, however, necessarily rejected Dana's claim that the contract included the additional "terms and conditions" allegedly set out in Dana's sales documents. Dana claims that this conclusion was contrary to the evidence.
Because judgments and orders are presumed to be correct, persons challenging them must affirmatively show reversible error. (Walling v. Kimball (1941) 17 Cal.2d 364, 373, 110 P.2d 58.) In a sufficiency of the evidence challenge, if there is substantial evidence, whether contradicted or uncontradicted, that supports the conclusion of the trier of fact, the judgment must be affirmed. (Crawford v. Southern Pacific Co. (1935) 3 Cal.2d 427, 429, 45 P.2d 183.) The testimony of a single witness, even if he is a party to the case, may be sufficient. (In re Marriage of Mix (1975) 14 Cal.3d 604, 614, 122 Cal. Rptr. 79, 536 P.2d 479.) This court does not decide the credibility of witnesses, as that is a function of the trier of fact. (People v. French (1978) 77 Cal.App.3d 511, 523, 143 Cal.Rptr. 782.) Nor do we reweigh the evidence. (Robinson v. Pediatric Affiliates Medical Group, Inc. (1979) 98 Cal.App.3d 907, 910, 159 Cal. Rptr. 791.) As already noted, we review the evidence in the light most favorable to the respondent in an appeal, giving it all reasonable inferences and resolving conflicts in the evidence in the respondent's favor. (Booth v. Robinson (1983) 147 Cal. App.3d 371, 377,195 Cal.Rptr. 130.)
With respect to the issue concerning the submission to the jury of Robinson's fraud claims, however, we apply a different standard. This is not a sufficiency of the evidence problem; we accept as true the evidence presented by Robinson as to the intentional misrepresentations and concealment of material facts by Dana. That is not the issue. Dana argues that, as a matter of law, Robinson can assert no claim for fraud, but is limited to its contract damages. This is a legal question relating to the application of the economic loss rule and the effect of the absence of any evidence of detrimental reliance. "Matters presenting pure questions of law, not involving the resolution of disputed facts, are subject to the reviewing court's independent or de novo review. [Citation.]" (Diamond Benefits Life Ins. Co. v. Troll (1998) 66 Cal.App.4th 1, 5, 77 Cal. Rptr.2d 581.)
We turn first to the fraud issues and conclude by addressing Robinson's contract claims.

2. The Economic Loss Rule-General Principles

The economic loss[12] rule has been applied to bar a plaintiffs tort recovery of *690 economic damages unless such damages are accompanied by some form of physical harm (i.e., bodily injury or property damage). "The economic loss doctrine marks the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, Which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others. . .. [¶] . . . [¶] Judicial hostility to the use of tort theory to recover purely economic losses predates the twentieth-century battle over product liability. This hostility was motivated primarily by the fear of mass litigation and the concern that traditional tort concepts were not capable of providing clear limitations on potentially limitless liability. Defining the scope of tort duty to include only physical harm created `built-in' limits on liability, since any given chain of events in the physical world has finite consequences. Permitting plaintiffs to recover [in tort] for purely economic losses would result in open-ended liability, since it is virtually impossible to predict the economic consequences of a given act." (Barrett, Recovery of Economic Loss in Tort for Construction Defects: A Critical Analysis (1989) 40 S.C.L.Rev. 891, 894-895, 898, fns. omitted.)
In the leading case of Seely v. White Motor Co. (1965) 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (Seely), our Supreme Court held that a manufacturer of a truck could be held strictly liable for physical injuries caused to person or property, but not for purely economic losses. Id. at pp. 18-19, 45 Cal.Rptr. 17, 403 P.2d 145.)[13] The Seely court held that contract and warranty law should govern the economic relationship between a buyer and a seller and between a manufacturer and a consumer. While the doctrine of strict liability in tort is properly extended to govern physical damage to a buyer's and/or a consumer's property as well as any personal injury caused by the product, it cannot be extended to cover a purely economic loss. (Ibid.)
The Seely court explained that, "The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the `luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business *691 unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone. [Citations.]" (Seely, supra, 63 Cal.2d at p. 18, 45 Cal.Rptr. 17, 403 P.2d 145.)
As the United States Supreme Court put it (citing Seely), in rejecting a product liability claim where malfunctioning turbines in a supertanker resulted only in an economic loss, "When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong, [¶] The tort concern with safety is reduced when an injury is only to the product itself. When a person is injured, the `cost of an injury and the loss of time or health may be an overwhelming misfortune,' and one the person is not prepared to meet. [Citation.] In contrast, when a product injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs, or, as in this case, experiences increased costs in performing a service. Losses like these can be insured. [Citations.] Society need not presume that a customer needs special protection. The increased cost to the public that would result from holding a manufacturer liable in tort for injury to the product itself is not justified. [Citation.] [H] Damage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or, in other words, that the customer has received `insufficient product value.' [Citation.] The maintenance of product value and quality is precisely the purpose of express and implied warranties. [Citations.] Therefore, a claim of a nonworking product can be brought as a breach-of-warranty action. Or, if the customer prefers, it can reject the product or revoke its acceptance and sue for breach of contract. [Citations.] [¶] Contract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements. The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies. [Citations.] In exchange, the purchaser pays less for the product. Since a commercial situation generally does not involve large disparities in bargaining power [citation], we see no reason to intrude into the parties' allocation of the risk." (East River S.S. Corp. v. Transamerica Delaval (1986) 476 U.S. 858, 871-873 [106 S.Ct. 2295, 2302-2303, 90 L.Ed.2d 865, 877-878], fns. omitted.)
In a recent decision, the Supreme Court of Nevada summarized the relevant underlying principles. "Contract law is designed to enforce the expectancy interests created by agreement between the parties and seeks to enforce standards of quality. 'This standard of quality must be defined by reference to that which the parties have agreed upon.' [Citation.] In contrast, tort law is designed to secure the protection of all citizens from the danger of physical harm to their persons or to their property and seeks to enforce standards of conduct. These standards are imposed by society, without regard to any agreement. Tort law has not traditionally protected strictly economic interests related to product qualityin other words, courts have generally refused to create a duty in tort to prevent *692 such economic losses. [Citation.]" (Calloway v. City of Reno (2000) 116 Nev. 250, 993 P.2d 1259, 1265-1266, italics in original.)
Although negligence was not an issue in Seely, the court purported to extend its limitation on recovery of economic losses to that theory as well. This may well have been dicta, but that is of no consequence. "This is because the principle articulated in Seely has by critical examination and application in subsequent cases been confirmed as law. Courts routinely apply Seely in strict liability and negligence cases alike to distinguish recoverable damages for physical injury from unrecoverable damages representing the benefit of a contractual bargain." (Aas v. Superior Court (2000) 24 Cal.4th 627, 640, 101 Cal.Rptr.2d 718, 12 P.3d 1125.)
For example, in Zamora v. Shell Oil Co. (1997) 55 Cal.App.4th 204, 208-211, 63 Cal. Rptr.2d 762, homeowners were not allowed to recover in negligence or strict liability for the cost of replacing water pipes known to be defective, but which had not yet leaked. In Fieldstone Co. v. Briggs Plumbing Products, Inc. (1997) 54 Cal. App.4th 357, 363-367, 62 Cal.Rptr.2d 701, a strict liability case, a general contractor could not recover the cost of replacing installed sinks that had rusted and chipped prematurely, because no other property had been damaged; in other words, the recovery in tort for a pure economic loss was not permitted. In San Francisco Unified School Dist. v. W.R. Grace & Co. (1995) 37 Cal.App.4th 1318, 1327-1330, 44 Cal.Rptr.2d 305, a public school district could not state a cause of action in negligence or strict liability based on the presence of asbestos products in its buildings, when the products had not contaminated the buildings by releasing friable asbestos. In Sacramento Regional Transit Dist. v. Grumman Flxible, supra, 158 Cal.App.3d at pp. 293-298, 204 Cal.Rptr. 736, the court held a transportation district could not recover in negligence or strict liability for the cost of repairing defective bus parts that had not caused further damage. "We believe," the court explained, that "the line between physical injury to property and economic loss reflects the line of demarcation between tort theory and contract theory." (Id. at p. 294, 204 Cal.Rptr. 736, italics added.)
In S.M. Wilson & Co. v. Smith Intern., Inc. (9th Cir.1978) 587 F.2d 1363, the court concluded that an aggrieved buyer's right should be limited to those provided by the Uniform Commercial Code. "Where the suit is between a non-performing seller and an aggrieved buyer and the injury consists of damage to the goods themselves and the costs of repair of such damage or a loss of profits that the deal had been expected to yield to the buyer, it would be sensible to limit the buyer's rights to those provided by the Uniform Commercial Code. [Citations.] To treat such a breach as an accident is to confuse disappointment with disaster. Whether the complaint is cast in terms of strict liability in tort or negligence should make no difference." (Id. at p. 1376.)
Another case applying the Seely rule went so far as to hold that the strict liability doctrine should not apply at all where sophisticated parties have the ability to allocate risks and avail themselves of the rights and remedies under commercial law.[14] The court reasoned that to permit *693 contract claims to masquerade as product liability torts would effectively frustrate the statutory rules established in the Commercial Code. (Kaiser Steel Corp. v. Westinghouse Elec. Corp. (1976) 55 Cal.App.3d 737, 747-748, 127 Cal.Rptr. 838 (Kaiser).) Under Kaiser, strict liability would be foreclosed "as between parties who: (1) deal in a commercial setting; (2) from positions of relatively equal economic strength; (3) bargain the specifications of the product; and (4) negotiate concerning the risk of loss from defects in [the product.] [Citation.]" (Id. at p. 748, 127 Cal. Rptr. 838.) Subsequent decisions have held that actual bargaining about risk allocation would not be required; it would be enough if the parties were so situated that they could have bargained on the issue. (See International Knights of Wine, Inc.v. Ball Corp. (1980) 110 Cal.App.3d 1001, 1007, fn. 1, 168 Cal.Rptr. 301; S.A. Empresa, etc. v. Boeing Co. (9th Cir.1981) 641 F.2d 746, 754.)
From all of these cases, we conclude that, in actions arising from the sale or purchase of a defective product, a plaintiff seeking to recover in tort rather than in contract must be able to demonstrate that its economic losses were accompanied by either (1) physical damage to property other than the defective product itself ("other property"),[15] or (2) bodily injury. If such evidence is not present, then the plaintiff is precluded from any tort recovery in either strict liability or negligence. Our Supreme Court recently summarized the general rule applicable in California. "A person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations. Instead, '"[c]ourts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies.' " [Citation.] This court recently rejected the argument that the negligent performance of a construction contract, without more, justifies an award of tort damages. [Citation.] In so doing, however, we reiterated that conduct amounting to a breach of contract becomes tortious when it also violates a duty independent of the contract arising from principles of tort *694 law. [Citation.] The strict liability and negligence cases . . ., which hold the builders of homes liable for construction defects causing property damage, may be understood as recognizing such an independent duty. But that duty is limited by the rule in Seely, . . ., which bars recovery of economic damages representing the lost benefit of a bargain." (Aas v. Superior Court, supra, 24 Cal.4th at p. 643, 101 Cal. Rptr.2d 718, 12 P.3d 1125; see also, East River S.S. Corp. v. Transamerica Delaval, supra, 476 U.S. at pp. 871-874, 106 S.Ct. 2295; Jimenez v. Superior Court, supra, 29 Cal.4th at pp. 481-483, 127 Cal.Rptr.2d 614, 58 P.3d 450, italics added.)

3. The Economic Loss Rule Also Applies in Cases of Intentional Fraud

While the economic loss rule precludes recovery of economic losses caused by breach of contract and/or warranty, absent physical harm to "other property" or bodily injury, under theories of either negligence or strict liability, no California case has yet addressed the question whether such rule should also bar a tort recovery for intentional misrepresentation or fraud. That is the question, however, that is presented by this case. To find the answer, we must look to decisions in other jurisdictions.
In Calloway v. City of Reno, supra, 116 Nev. 250, 993 P.2d 1259, the issue arose in the factual context of allegedly defective roofing, framing, siding, plumbing and heating and air conditioning installed in a number of townhomes. The homeowners' negligence and strict liability claims against the framing subcontractors were dismissed, and such dismissals were affirmed on appeal. The appellate court concluded that the claims were barred by the economic loss doctrine and that townhomes were not products for purposes of strict liability. (Id. at p. 1273.)
The Calloway court's discussion of the proper analytical framework is useful here: "[T]he more reasoned method of analyzing the economic loss doctrine is to examine the relevant policies in order to ascertain the proper boundary between the distinct civil law duties that exist separately in contract and tort. . . . [Permitting tort recovery for economic losses from construction defects would create a general, societally imposed duty on the part of builders and developers to avoid such losses. These losses are not properly addressed by tort law, which has as its underlying policy the promotion of safety. Instead, such harm is paradigmatically addressed by the policies underlying contract lawto enforce standards of quality as defined by the parties' contractual relationships." (Calloway, supra, 993 P.2d at pp. 1266-1267, fn. 3.) We believe the same principles apply to the consideration of whether the economic loss rule should be applied to preclude an action for intentional fraud. That has likewise been the analytical framework adopted by those courts that have considered the issue.
In Huron Tool v. Precision Consulting Serv. (1995) 209 Mich.App. 365 [532 N.W.2d 541] (Huron), a manufacturer sued a consulting service for breach of contract, breach of warranty, fraud and misrepresentation, alleging that the consulting service had supplied defective software. The alleged fraudulent representations, however, concerned only the quality and characteristics of the software system that had been sold to the plaintiff. Such representations were indistinguishable from the terms of the contract and warranty that the plaintiff manufacturer alleged were breached. There was no allegation that the consulting service committed any wrongdoing independent of the alleged breach of contract and warranty. Put another way, the plaintiffs *695 allegations of fraud did not involve the inducement for the plaintiff manufacturer to enter into the contract, but rather related entirely to the defendant's performance of the terms of the contract; in short, the alleged misrepresentations were not extraneous to the contractual dispute.
The Huron court concluded that, under such circumstances, the plaintiff was limited to its remedies under the Uniform Commercial Code. The court accepted the principle that the economic loss rule can apply to bar a fraud claim, but rejected the general proposition that it barred the prosecution of all fraud claims. After reviewing a number of cases from several jurisdictions, it concluded that a distinction has been made between fraud in the inducement of the contract, which is not barred by the economic loss rule, and fraudulent misrepresentations relating to the performance of the contract, which are barred.
"The distinction is critical, for the essence of the `economic loss' rule is that contract law and tort law are separate and distinct, and the courts should maintain that separation in the allowable remedies. There is a danger that tort remedies could simply engulf the contractual remedies and thereby undermine the reliability of commercial transactions. Once the contract has been made, the parties should be governed by it. [¶] Fraud in the inducement, however, addresses a situation where the claim is that one party was tricked into contracting. It is based on pre-contractual conduct which is, under the law, a recognized tort. [Citation.]" (Huron, supra, 532 N.W.2d at pp. 544-545.) "In light of this rationale, we decline to adopt defendants' position that the economic loss doctrine precludes any fraud claim. Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freelywhich normally would constitute grounds for invoking the economic loss doctrinebut where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior. In contrast, where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold, the other party is still free to negotiate warranty and other terms to account for possible defects in the goods." (Id at p. 545.)
Thus, a fraud committed with respect to the performance of a contract that does not induce a plaintiff to enter into additional undertakings or cause any harm distinct from that caused by the breach of contract does not give rise to an independent action in tort. (Ibid.) This analysis and result has been followed by a number of courts.
Most recently, in Werwinski v. Ford Motor Co. (3rd Cir.2002) 286 F.3d 661, the court rejected a fraud claim brought in a prospective class action against a manufacturer of allegedly defective transmissions, in which automobile purchasers alleged that Ford had concealed knowledge about the defective parts. The issue before the federal court was whether the Pennsylvania Supreme Court would adopt and apply the economic loss rule to intentional fraud actions. (Id. at p. 670.) The court, predicting that Pennsylvania's highest state court probably would apply the doctrine to intentional fraud claims, adopted the Huron analysis (id. at pp. 674-681) and held that since the plaintiffs' fraudulent concealment claims related to the quality or character of the goods sold, they were clearly "`intertwined'" with and not "`extraneous' " to the plaintiffs' breach of warranty claims. Moreover, since "the alleged fraudulent concealment did not cause harm to the plaintiffs distinct from those caused by the breach of contract; and the mere fact that disclosure of certain facts to plaintiffs may have allowed them to take *696 corrective action does not change the result,' " in other words, it did not create any right to sue for fraud. (Id. at p. 678; italics added.) "The economic loss doctrine is designed to place a check on limitless liability for manufacturers and establish clear boundaries between tort and contract law. Carving out an exception for intentional fraud would eliminate that check on liability and blur the boundaries between the two areas of law, thus exposing manufacturers to substantially greater liability. In light of these realities, we select the path that limits liability by rejecting appellants' request for an intentional fraud exception." (Id. at pp. 680-681.)
In Cooper Power-Systems v. Union Carbide (7th Cir.1997) 123 F.3d 675, defendant manufacturer of resin used in paint was sued by plaintiff manufacturer of parts after the parts manufacturer used the paint, which did not perform as warranted. The plaintiff sued for breach of contract and warranty, and for negligence and misrepresentation. Applying Wisconsin's "economic loss" rule, the federal appellate court held that such misrepresentations concerning the quality of the product sold, even if intentional, were properly remedied through claims for breach of warranty. There was no exception to the economic loss rule that would permit a tort action for intentional misrepresentation. (Id. at p. 682.)
In AKA Distributing Co. v. Whirlpool Corp. (8th Cir.1998) 137 F.3d 1083, another federal appellate court, in attempting to predict how the Minnesota Supreme Court would rule, held that the alleged breach of the defendant manufacturer's oral promise (for a "long term" distributorship relationship with the plaintiff) did not permit a recovery on a claim of fraud. The alleged misrepresentation had resulted only in an economic loss to the plaintiff. "A fraud claim independent of the contract is actionable, but it must be based upon a misrepresentation that was outside of or collateral to the contract, such as many claims of fraudulent inducement. That distinction has been drawn by courts applying traditional contract and tort remedy principles. [Citations.] It has been borrowed (not always with attribution) by courts applying the economic loss doctrine to claims of fraud between parties to commercial transactions. [Citations.] We think the Minnesota Supreme Court would resolve the legal issue in this case by holding that, in a suit between merchants, a fraud claim to recover economic losses must be independent of the Article 2 contract or it is precluded by the economic loss doctrine." (Id. at pp. 1086-1087.)[16]
In Dinsmore Instrument Co. v. Bombardier, Inc. (6th Cir.1999) 199 F.3d 318, the plaintiff, a manufacturer of compasses, entered into a contract with Bombadier, the manufacturer of personal jet-ski recreational water vehicles, and Digico, Bombadier's subcontractor, whereby plaintiff was to manufacture compasses to Bombadier's specifications, which would then be installed in the jet-skis by Digico. After unspecified contractual problems between the *697 parties, plaintiff sued Bombadier and Digico in tort, alleging two theories: (1) Bombadier's real motive for entering into the contract had been to steal plaintiffs trade secrets and to drive it out of business, and (2) Digico had interfered with plaintiffs and Bombadier's contractual relationship in an attempt to improve its own business relationship with Bombadier.
Applying the law of Michigan, the court held that the economic loss doctrine precluded any tort recovery. The fraud claims were not extraneous to the contractual dispute that arose between the parties. "`Where a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only "economic" losses.' [Citation.]" (Id. at p. 320.) "The economic loss doctrine helps ensure that contract claims are resolved by contract law. `If a commercial purchaser were allowed to sue in tort to recover economic loss, the UCC provisions designed to govern such disputes . . . could be entirely avoided. . . . In any event, Article 2 would be rendered meaningless and . . . "contract law would drown in a sea of tort."` [Citation.]" (Id. at p. 320.)
Finally, in HTP v. Lineas Aereas Costarricenses (Fla.1996) 685 So.2d 1238, a case in which the alleged fraudulent inducement of a settlement agreement between parties to a commercial transaction caused the plaintiff only economic losses, the Florida Supreme Court held that a fraudulent inducement was a tort independent of the parties' contract. "The economic loss rule has not eliminated causes of action based upon torts independent of the contractual breach even though there exists a breach of contract action. Where a contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from acts that breached the contract. [Citations.]" (Id. at p. 1239.) "`Fraud in the inducement presents a special situation where parties to a contract appear to negotiate freely which normally would constitute grounds for invoking the economic loss doctrine but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior. . ..'". (Id. at p. 1240, quoting Huron, supra, 532 N.W.2d at p. 545, cf. Rich Products Corp. v. Kemutec, Inc. (E.D.Wis.1999) 66 F.Supp.2d 937, 977-980, affd. (7th Cir.2001) 241 F.3d 915 and Budgetel Inns, Inc. v. Micros Systems, Inc. (E.D.Wis.1998) 8 F.Supp.2d 1137, 1144-1149 [where both federal District Courts went even further than Huron and held that the economic loss rule would also preclude an action based on a fraudulent inducement ].)[17]
Applying these principles to the case before us, we conclude that Robinson has no independent tort action and no viable claim for fraud. Viewing the evidence, as we must, in the light most favorable to the judgment, Robinson has neither claimed nor established any fraudulent representation or concealment that was not intertwined with Dana's performance of its contract and warranty breaches. Indeed, Robinson's analysis of its own claim really *698 makes that clear. Robinson argues that Dana's "independent" tortious action consisted of a breach of: (1) its duty under FAA rules not to make unapproved changes in the manufacture of aircraft parts that have received a type certificate, (2) its duty under tort law not to engage in fraud accompanying a breach of contract; (3) its duty under tort law not to breach a contract by means that involve deceit or coercion and (4) its duty under tort law governing its conduct after breaching its contract with Robinson.
Even a cursory examination of these claims, however, demonstrates that they are not independent of the breach of contract and warranty claims, but are inextricably intertwined therewith and, but for the contract breach, would not even exist. In articulating the first claimed "independent duty," Robinson ignores the fact that Dana was already contractually bound not to make any unapproved design changes. The fact that Dana's breach of that contractual commitment also may have violated a federal regulation does not provide a basis for allowing a tort remedy in favor of Robinson. Moreover, such circumstance did not occasion Robinson any additional damage.
With respect to the second and third duties allegedly breached by Dana, their viability necessarily depends on the existence of a tort for the "fraudulent" breach of a contract. We are, however, aware of no authority supporting the existence of such a tort in the abstract and Robinson cites us to none. Absent circumstances not present here, the breach of a contract is just that, nothing more the law does not inquire into the motive or state of mind of the breaching party. (Applied Equipment Corp. v. Litton Saudi Arabia Ltd. (1994) 7 Cal.4th 503, 515-516, 28 Cal. Rptr.2d 475, 869 P.2d 454.) Conduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort law. "`The law imposes the obligation that "every person is bound without contract to abstain from injuring the person or property of another, or infringing upon any of his rights." (Sec.1708, Civ. Code.) This duty is independent of the contract. . .. "[A]n omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty." ` [Citation; italics added.] [¶] The differences between contract and tort give rise to distinctions in assessing damages and in evaluating underlying motives for particular courses of conduct. Contract damages seek to approximate the agreed-upon performance. `[I]n the law of contracts the theory is that the party injured by breach should receive as nearly as possible the equivalent of the benefits of performance.' [Citations.]" (Id. at p. 515, 28 Cal.Rptr.2d 475, 869 P.2d 454.) . . . [11] . . . "Within the different spheres of contract and tort, motivations for conduct are also treated differently. In an intentional tort action, motives amounting to malice, oppression, or fraud may justify punitive damages. (Civ.Code, § 3294.) But the law generally does not distinguish between good and bad motives for breaching a contract. `[I]n traditional contract law, the motive of the breaching party generally has no bearing on the scope of damages that the injured party may recover for the breach of the implied covenant [of good faith and fair dealing]; the remedies are limited to contract damages.' [Citation; italics in original.] `Varying personal or economic reasons motivate one to breach his contract, but the general rule is that . . . motives . . . are immaterial and cannot be inquired into on the question of compensatory damages.' [Citations.]" (Id. at p. 516, 28 Cal.Rptr.2d 475, 869 P.2d 454.) "The imposition of tort remedies for `bad' breaches of commercial contracts is a substantial *699 deviation from the traditional approach which was blind to the motive for the breach." (Harris v. Atlantic Richfield Co. (1993) 14 Cal.App.4th 70, 82, 17 Cal. Rptr.2d 649.)
Finally, Dana cannot be held liable in tort for its "post breach" activity in denying liability for the claimed breach and refusing to pay the damages demanded by Robinson. Indeed, there was nothing tortious about the disagreement between Dana and Robinson concerning the cause of the clutch problems or who should bear legal responsibility for Robinson's losses. Dana's decision to charge Robinson for replacement clutches rather than acknowledge its responsibility for those losses was a logical consequence of Dana's position that it did not cause those losses. Robinson's efforts to turn Dana's denial of breach liability into a violation of an alleged duty independent of contract would appear to be nothing more than an attempt to revive the tort of "bad faith" denial of contract that was rejected in Freeman & Mills, Inc. v. Belcher Oil Co. (1995) 11 Cal.4th 85, 102-103, 44 Cal. Rptr.2d 420, 900 P.2d 669; see also Du-Barry Internat., Inc. v. Southwest Forest Industries, Inc. (1991) 231 Cal.App.3d 552, 575-576, 282 Cal.Rptr. 181.
Further, it seems clear that had the claimed fraudulent concealment not occurred and had Dana instead made a prompt disclosure of all of the facts, Robinson's damages would not have been any less or different. Dana's failure, prior to November 30, 1998, to advise Robinson that it had altered a manufacturing process, plus its repeated certifications that the clutch sprags were manufactured in accordance with the established design and specifications, may have induced Robinson to continue to purchase and install the clutches in its helicopters, but such "reliance" by Robinson did not result in any detriment to it beyond the damages already covered by the contract and warranty breach claims. With respect to Dana's failure to disclose the requested information regarding the clutch serial numbers following the November 30, 1998 disclosure of the July 1996-October 1997 alteration in the manufacturing process, we do not see how the delay in disclosing the specific serial numbers adversely impacted Robinson. We agree with the argument made by Dana in its reply brief: "Whether or not Dana had some obligation to provide that information (relating to the serial numbers of the defective sprag clutches) sooner than it did, its failure to do so cannot be characterized as deception that induced any reliance by Robinson. Moreover, there is no evidence that Robinson suffered any damages as a result of Dana's alleged delay. Whether Dana disclosed the lot numbers in December 1998 or February 1999, Robinson would have taken the same action to replace the clutches and would have incurred the same costs."
There were no helicopter accidents caused by any defective clutch, nor any claim of physical damage to any helicopter or other property, nor any bodily injury flowing from the use or operation of the defective clutches. As a result, we conclude that all of Robinson's damages are embraced by the terms of the contract and the warranty agreement negotiated by the parties. Thus, the economic loss rule precludes any recovery by Robinson for intentional fraud.[18]

4. The Evidence Establishes a Breach of Contract

The record clearly demonstrates that Dana and Robinson entered into a *700 contract under which Dana would manufacture sprag clutches for Robinson's helicopters according to FAA approved specifications supplied by Robinson. The evidence reflects that one of those specifications related to the level of hardness. The evidence also reflects that, for a 15-month period, Dana manufactured the clutches at a higher-than-specified level of hardness. Such change was made for undisclosed reasons, but Robinson did not approve or agree to it. Despite such change, Dana continued to certify that clutches shipped to Robinson were manufactured according to the required specifications. These actions constituted Dana's breach of the sales agreement.
Dana argues that under the terms and conditions of its sales documents, it had a unilateral right to change the hardness level. That may be so (although Robinson's agreement to such a provision would have been inconsistent with its undisputed contractual right to control deviations from the original approved specifications), but such circumstance does not aid Dana. The problem with Dana's argument is that there was conflicting evidence as to whether or not Robinson was aware of, or had agreed to, any of the terms and conditions printed on the reverse side of Dana's sales documents. For example, the copy of such terms and conditions in the record that has been cited to us is totally illegible. This issue was presented and argued to the jury. It decided (12-0) that Dana had breached its contract and warranty commitments. This conclusion necessarily implies a finding in favor of Robinson on the disputed issue of Robinson's claimed agreement to the terms and conditions upon which Dana relies to deny contractual liability.
This record clearly contains substantial evidence supporting the jury's conclusion. We are bound by that determination. (See Morey v. Vannucci (1998) 64 Gal.App.4th 904, 912-913, 75 Cal.Rptr.2d 573.)[19]

CONCLUSION
As we have concluded that Robinson has no available remedy in tort, and thus its claim of fraudulent concealment cannot succeed, it follows that the award of punitive damages must fall. Punitive damages may only be awarded upon clear and convincing evidence of "oppression, fraud, or malice" in the "breach of an obligation not arising from contract." (Civ.Code, § 3294, subd. (a); italics added.) Punitive damages are not available in actions based upon breach of contract in non-insurance cases. (See, e.g., cates Construction, Inc. v. Talbot Partners (1999) 21 Cal.4th 28, 61, 86 Cal.Rptr.2d 855, 980 P.2d 407 [tort recovery and punitive damages were not appropriate for a breach of the implied covenant of good faith and fair dealing arising out of a dispute between a commercial surety and real estate developer over surety's refusal to perform the terms of their agreement]; Freeman & Mills, Inc. v. Belcher Oil Co., supra, 11 Cal.4th at pp. 102-103, 44 Cal. Rptr.2d 420, 900 P.2d 669 [overruling prior precedent that had recognized the tort of bad faith "denial of contract"]; Applied Equipment Corp. v. Litton Saudi Arabia Ltd., supra, 7 Cal.4th at p. 516, 28 Cal. Rptr.2d 475, 869 P.2d 454 ["In the absence of an independent tort, punitive damages may not be awarded for breach of contract" *701 even where the breach was "`wilful, fraudulent, or malicious'"].) This rule is based in part upon the important policy concern of providing predictability in commercial transactions and respecting the freedom of contract by restricting a contracting party to its contractual remedies for breach. (Cates Construction, Inc. v. Talbot Partners, supra, 21 Cal.4th at pp. 52-53, 86 Cal.Rptr.2d 855, 980 P.2d 407; Freeman & Mills, Inc. v. Belcher Oil Co., supra, 11 Cal.4th at p. 94, 44 Cal.Rptr.2d 420, 900 P.2d 669; Applied Equipment Corp. v. Litton Saudi Arabia Ltd., supra, 7 Cal.4th at p. 517, 28 Cal.Rptr.2d 475, 869 P.2d 454.) Thus, "[a] person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations." (Aas v. Superior Court, supra, 24 Cal.4th at p. 643, 101 Cal.Rptr.2d 718, 12 P.3d 1125.)
On its contract and warranty claims, however, Robinson is entitled to prevail and the jury's award of contract damages should be affirmed.

DISPOSITION
The judgment is reversed in so far as it awards compensatory and punitive damages for intentional and negligent misrepresentation or fraudulent concealment; in all other respects it is affirmed. Each party shall bear its own costs on appeal.
We Concur: KLEIN, P.J., and KITCHING, J.
NOTES
[1] Dana was sued in this matter as Dana Corporation, dba Dana Corporation, a Virginia Corporation, dba Warner Electric Division and Formsprag Division.
[2] As Robinson prevailed below, the facts we recite, including all reasonable inferences to be drawn therefrom, are those that support the jury's verdict. We do not, however, include argumentative or speculative conclusions.
[3] Robinson emphasizes that this is particularly important for the R22 model. Since it is used as a trainer, it engages in autorotation on a regular basis. A properly functioning sprag clutch is vital to the performance of this critical safety function.
[4] In this case, the record reflects that Dana's quotation and sales documents contained certain provisions on the reverse thereof including a reservation of "the right at any time to make changes in drawings, designs, specifications [or] materials. . .." In addition, those provisions included a warranty that the clutches manufactured by Dana "will be free from defects in material and workmanship for a period of twelve (12) months from the date of delivery," and that "its products will conform to drawings and specifications mutually agreed upon in writing." The express warranties required that written notice of any claimed defect be provided within 30 days of the time that the defect is or "should have been" discovered. In capital letters, the warranty provisions also stated that: "This warranty is in lieu of and excludes all other warranties, expressed or implied, including warranties of merchantability and of fitness for a particular purpose, arising by operation of law or otherwise, and in no event will seller be liable for incidental or consequential damages." Robinson, however, contends it never saw nor accepted these provisions. Thus, this was a disputed issue. There was evidence presented at trial that supports the conclusion that either the reverse sides of the Dana sales documents were never sent to Robinson or were unreadable. Indeed, the copy of the terms and conditions set out on the reverse side of the Dana sales documents that is included in the appellate record is totally illegible.
[5] It would appear that Robinson makes no claim in this case that Dana had any fraudulent intent in changing its grinding standard. At oral argument on Dana's motions for new trial and judgment notwithstanding the verdict, Robinson's counsel (Raymond E. Hane, III, Esq.) stated: "`But the conduct was the concealment, as your Honor pointed out. The conduct wasn't changing the process. They're right. I don't think there was any malice or malicious intent when they changed the grinding process.' [¶] The Court: `They probably didn't even realize that there would be a problem.' [¶] Mr. Hane: `No, I don't think there was.'"
[6] A typical purchase order from Robinson stated, "Vendors must receive [Robinson's] approval prior to shipment on nonconforming components or assemblies.'' It also provided that a "Certificate of Conformance [is] Required." With every lot of clutches sold to Robinson, Dana provided such a certificate. Such certificates typically stated, "This is to certify [ ] pieces of part number [ ] related to your purchase order [ ] have been processed, fabricated and received final inspection in accordance with the applicable blueprint specifications and the purchase order requirements, with pertinent data relative thereto, maintained and on file."
[7] The evidence presented at trial, however, also reflected that Dana had received no complaints from its other customers who had purchased sprag clutches ground at the higher 61/63 hardness level.
[8] Robinson placed great emphasis on this delay, contending that Dana had had the necessary information all along, but had withheld it. For example, the record reflects that there were two copies of a letter sent by Dana to Robinson, dated December 3, 1998, listing the hardness of the lots of sprag clutches sold to Robinson. The copy sent to Robinson did not show the serial numbers. The copy later discovered in Dana's possession did reflect the serial numbers. Robinson draws the rather speculative inference that Dana knew those numbers on December 3, 1998 and must have "whited" them out. Dana's officer, however, testified that when he ultimately determined the serial numbers he simply added them to his copy of the December 3 letter, rather than preparing a new letter. Whatever the truth on this issue, the jury apparently accepted Robinson's argument that Dana had intentionally withheld this information.
[9] As already noted, Dana was Robinson's sole supplier of the sprag clutches needed for the manufacture of its helicopters.
[10] We note here that the terms upon which Dana relies are those that were printed on the reverse side of Dana's quotation and sale documents. As noted above, Robinson claimed it never saw nor accepted such terms. The jury obviously accepted the evidence that favored Robinson's position.
[11] Dana argues that the jury was improperly not told that the "terms and conditions" in Dana's sales documents (see fn. 4, ante) controlled, and thus was precluded from reaching and deciding: (1) whether Robinson provided notice of the claimed defect in Dana's clutches within thirty days of discovery (as required by the "terms and conditions"); (2) whether the clutches that Robinson claimed were defective had been purchased within the last twelve months (as required by the "terms and conditions"); or, (3) whether Robinson's claimed damages were "incidental or consequential" damages precluded under Dana's limitation on damages.
[12] The term "economic loss" has been defined as "`damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits without any claim of personal injury or damages to other property. . ..' [Citations.]" (Sacramento Regional Transit Dist. v. Grumman Flxible (1984) 158 Cal.App.3d 289, 294, 204 Cal.Rptr. 736.) One commentator defines purely economic loss as "the financial harm arising out of wrongful interference with plaintiff's contractual relations or with his or her noncontractual prospective gain." (Rizzo, A Theory of Economic Loss in the Law of Torts, 11 J. Legal Stud. 281, 281 (1982).) "Although purely economic loss usually occurs in the form of lost profits, it may also include consequential damages, loss of expected proceeds, lost opportunities, diminution in the value of the allegedly defective property, the costs of repair and replacement, loss of use, loss of good will, and damages paid to third parties as a result of a defendant's negligence." (North American Chemical Co. v. Superior Court (1997) 59 Cal. App.4th 764, 777, fn. 8, 69 Cal.Rptr.2d 466, citing Segalla and Nowak, Economic Loss Rule: Foreseeability-Dialogue of the 90's?, 45 Fed'n. of Ins. & Corp. Couns. Q. 25, 26 (Fall, 1994).)
[13] In Seely, plaintiff had purchased a truck from the defendant manufacturer for use in his business of heavy-duty hauling. He sued the defendant for the damages (consisting of the cost of repairing the truck, with no personal injury damages) after an accident when the brakes failed, as well as for damages (consisting of lost profits and the purchase price of the truck) that were unrelated to that accident, but were sustained because he was unable to make normal use of the truck because of a manufacturing defect that had caused it to bounce heavily or "gallop" from the date of purchase. The trial court found that plaintiff had failed to prove that the "galloping" condition had caused the accident and therefore denied recovery for the truck repairs. However, it did award plaintiff both lost profits and his purchase price (i.e., his economic damages) based upon the defendant's breach of warranty. The Supreme Court held that such an award "was proper on the basis of a breach of express warranty" (Seely, supra, 63 Cal.2d at p. 13, 45 Cal.Rptr. 17, 403 P.2d 145), and affirmed the judgment of the trial court.
[14] Commercial Code sections 2718 and 2719, for example, expressly anticipate and provide for damage negotiation between the parties to contracts involving the sale of goods:

Section 2718 provides, in pertinent part:
"(1) Damages for breach by either party may be liquidated in the agreement subject to and in compliance with Section 1671 of the Civil Code. If the agreement provides for liquidation of damages, and such provision does not comply with Section 1671 of the Civil Code, remedy may be had as provided in this division."
Section 2719 provides:
"(1) Subject to the provisions of subdivisions (2) and (3) of this section and of the preceding section on liquidation and limitation of damages,
"(a) The agreement may provide for remedies in addition to or in substitution for those provided in this division and may limit or alter the measure of damages recoverable under this division, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and
"(b) Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.
"(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code.
"(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is invalid unless it is proved that the limitation is not unconscionable. Limitation of consequential damages where the loss is commercial is valid unless it is proved that the limitation is unconscionable."
[15] See Jimenez v. Superior Court (2002) 29 Cal.4th 473, 483-484, 127 Cal.Rptr.2d 614, 58 P.3d 450, for a consideration of the principles applicable to determining whether "other property" includes the larger product into which a smaller defective product is incorporated.
[16] But see the Minnesota statute that codifies the economic loss rule as it applies to the sale of goods, which was recently amended (Laws 1998, 1st Sp., ch. 2, § 1) to specifically provide that the law should not be interpreted to bar tort claims based on fraud. (Minn.Stat. § 604.10, subd. (e) ["This section shall not be interpreted to bar tort causes of action based upon fraud or fraudulent or intentional misrepresentation or limit remedies for those actions"].) The court in AKA Distributing, supra, specifically noted that the statute was "limited to sale of goods, whereas we deal here with a different type of Article 2 contract. We see no indication that the statute was intended to replace or narrow the scope of the broader common law doctrine." (AKA Distributing, supra, 137 F.3d at p. 1086, fn. 3.)
[17] However, the court in Budgetel Inns, Inc., supra, went so far as to suggest that the economic loss doctrine would always preclude an action based on fraud, for which it was criticized by the courts in Rich Products Corp., supra, 66 F.Supp.2d at pp. 977-980 and Werwinski, supra, 286 F.3d at pp. 677-678. These courts held that the economic loss doctrine only precluded fraud actions if the fraud related to the quality or characteristics of the subject matter of the contract or the offending party's expected performance of the contract.
[18] Necessarily, such a conclusion would also preclude any recovery by Robinson on a theory of negligent misrepresentation.
[19] Dana makes no argument as to the amount of damages awarded to Robinson for Dana's breach of contract and warranty. We therefore do not consider that issue. In upholding the jury's conclusion that the provisions of Dana's form sales documents were neither accepted nor agreed to, we also affirm the jury's determination that Robinson suffered damages in the sum of $1,533,924.